Filed 2/18/15  P. v. Arevalos CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUAN AREVALOS,<br><br>    Defendant and Appellant. | 2d Crim. No. B253663<br>(Super. Ct. No. BA401679)<br>(Los Angeles County) |

An information charged appellant Juan Arevalos with committing a lewd or lascivious act upon a child.  (Pen. Code, § 288, subd. (a).)  The act alleged was his purportedly touching the chest and the vaginal area of the 9- or 10-year-old victim during a chance encounter in a church kitchen where the minor, T.R., went to eat a piece of bread.  The physical contact was over the child's clothing and was extremely brief.  It went unreported until about two years later when T.R. reported it to her mother.  At trial the prosecution introduced evidence from a 24-year-old woman who claimed to have been similarly accosted by defendant over a decade before.

Following a jury trial, appellant was convicted and sentenced to three years in prison.  The court imposed a $300 restitution fine (Pen. Code, § 1202.4, subd. (b)), a suspended $300 parole revocation restitution fine (*id.* § 1202.45), a $300 sex offense fine (*id.* § 290.3), a $40 court security fee (*id.* § 1465.8), and a $30 criminal conviction

assessment (Gov. Code, § 70373). Appellant was awarded 95 days of presentence custody credit.

Appellant contends that section 1108 of the Evidence Code,[1] under which evidence of his uncharged sexual misconduct was admitted, was applied erroneously and is facially unconstitutional. We agree that the trial court applied the wrong legal standard and failed to consider relevant factors, such as the degree of certainty that appellant committed the alleged prior misconduct, that conduct's remoteness, and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, as required by section 352. But even applying an analysis that would gauge the admissibility of such evidence by recourse to section 352, the evidence offered by the prosecution and admitted by the court was prejudicial and of such dubious merit that the fundamental fairness of the trial is called into question. Because the error was not harmless, we reverse.[2]

## FACTS

### *Charged Conduct*

### *Prosecution Evidence*

Victim T.R. was 13 years old when she testified at trial. One night, when she was nine or ten years old, her mother had to work late. Her grandmother took her to a church that she belonged to. The church had a room where services were conducted and an adjacent kitchen. T.R. went into the kitchen to get some bread because she was hungry. The church services were still going on, and she thought she was alone. All of a sudden, T.R. felt someone behind her. It was appellant. He grabbed her chest with his left hand and her vagina with his right hand, on top of her clothes. It felt "disgusting" to her. Afterwards, appellant went in front of T.R. and put his finger on his mouth. She took this gesture to mean that she should be quiet and not say anything. He then walked

---

[1] All further statutory references are to the Evidence Code unless otherwise stated.
[2] In light of our holding, we need not reach appellant's argument about the constitutionality of section 1108.

out of the room smiling. T.R. saw appellant another time when she visited her grandmother at a different church. Appellant shook her hand but did not say anything.

T.R. did not immediately tell anyone about what appellant did to her because she was afraid that he would hurt her family. When she was around 12 years old, she told her mother. T.R.'s mother took her to the police station, where they reported the incident. T.R. remembered that appellant had a gold tooth and drew a picture for the police. When appellant was arrested, he had a silver tooth. T.R. immediately identified him from a photographic six-pack.

Cheryl M. (Cheryl) is T.R.'s mother. One day she was working late and T.R.'s grandmother took T.R. to church. When Cheryl picked her up, T.R. went to the back of the car and kept crying. When Cheryl questioned her, she did not say anything. After that day, Cheryl noticed a "drastic change" in how T.R. acted. She hardly talked to anybody or smiled. She was always upset or angry. She gained a tremendous amount of weight. Cheryl continued to ask T.R. what was wrong, but she would not say anything.

When T.R. eventually told her mother about the incident with appellant, Cheryl asked T.R.'s grandmother if she knew any men at her church from that time with gold teeth. Appellant and his family attended T.R.'s grandmother's church three or more times a week. Cheryl, who usually did not go to church, did not know appellant. T.R. could not remember if she had ever seen appellant before the groping incident. Cheryl took T.R. to the police. Based on T.R.'s drawing and the description given by T.R.'s grandmother, Cheryl identified appellant to the police.

Nicole Farrell is a forensic interview specialist who was on the team that interviewed T.R. She testified that memory is use-dependant and improves with age in children, who first start to form memories around age three. Memory for a child is reconstructive and influenced by environmental factors. If the recollection of a memory is distressing, a child will avoid thinking about it, which can result in some peripheral or extraneous details being shed.

Children delay reporting instances of sexual abuse about 85 percent of the time. One factor that influences the delay in reporting sexual abuse is the relationship

3

between the child victim and the sexual offender. If the offender lives in the child's home, the child typically delays reporting the abuse. If the offender is a stranger, the child may be inclined to tell someone more rapidly unless there is a grave sense of fear, shame, or disgust. Children are socialized not to say anything negative about adult conduct. A history of being responded to in a safe and timely manner is one factor that might empower a child to make an immediate disclosure.

*Defense Evidence*

Officer Sandra Carlisle spoke to T.R. alone when her mother brought her to the police station to report the groping incident. T.R. told Officer Carlisle that appellant grabbed her after she had turned around and was facing appellant. Officer Carlisle had T.R. stand in front of her and show her what happened to make sure that she understood for the police report. Cheryl did not say anything to Officer Carlisle about a distinct change in T.R.'s behavior two years earlier. At the police station, Cheryl seemed to be "devastated," "very traumatized," and "extremely confused."

Ana Castillo considers appellant to be her husband. At the time of trial, they had lived together for 12 years and had two sons. Castillo knew Cheryl and had had personal contact with her. Castillo used to be friends with Ana Zepeda, the babysitter who at one time took care of Cheryl's children. Castillo's sons and T.R. attended the same school.

According to Castillo, Cheryl once asked her if she wanted to drive a "pirate" taxi in the evenings like Cheryl did. Cheryl told her that she (Cheryl) would get a commission if she recruited new people. Castillo said no. Cheryl became upset and said something threatening to Castillo. Cheryl admitted working for an unlicensed taxi company but denied the rest of Castillo's story.

Subsequently, Castillo learned that T.R. needed some clothing. Castillo had leftover inventory of children's clothing from a business she ran. Cheryl took the clothes and agreed to pay Castillo $150 in installments. Castillo asked for the money several times. The last time, in 2006 (when T.R. was about seven years old), was at Cheryl's house. Cheryl threatened to have Castillo and appellant deported if Castillo kept

4

charging her. Cheryl denied that this incident occurred but admitted that Castillo was once in her home while Zepeda was there in 2006 or 2007.

Emma Merino attended the church with appellant since 2008. She attended services all the time and never missed a day. She knew who T.R. was but only saw her at church about three times. She never saw T.R. together with appellant at all. She never saw T.R. or anyone else go into the kitchen alone to have something to eat.

<u>*Uncharged Conduct*</u>

*Prosecution Evidence*

Twenty-four-year-old Jessica B. testified that she went to church with her mother almost every evening when she was a child. Approximately 20 people attended these services on a regular basis. Appellant sometimes attended with his son. Jessica thought she probably had spoken with appellant a few times but "[not] more than just a 'hi' and 'bye.'" She knew he lived in an apartment behind the church but had never been there.

After the services ended at around 9:00 to 9:30 p.m., Jessica and the five or so other kids usually would go outside to play in the parking lot. Appellant's son joined them a few times. Once, when she was around 10 years old, Jessica was "more than likely" going towards the parking lot where the other kids were playing when appellant cornered her in the doorway to a dentist's office. It was dark outside. The adults were still inside the church.

Appellant stuck his hand inside Jessica's underwear and touched a "private part." It hurt, and she felt "scared" and "embarrassed." She kicked him, ran inside the church, and told her mother what happened. At some point, Jessica and her mother went to the police station to file a report. Jessica was unsure how long after the incident they waited to report it. Appellant was brought in for questioning and released without being charged. Jessica does not know T.R.

Farrell, the forensic interview specialist, testified that some children are victimized multiple times by different people. One risk factor for polyvictimization is

when a child has multiple psychosocial stressors in his or her life, such as an unsafe physical environment, violence in the home, or neglect by the care provider.

*Defense Evidence*

By the time she was 11 years old, Jessica was experiencing mental health issues. At the time of trial, she was taking antipsychotic medication. She was supposed to take the medication as a child but did not because her mother prevented her for religious reasons. Jessica had not talked about the incident with appellant for 10 years and had done her best to forget it. The police report stated that the incident with appellant occurred at noon, that Jessica was already playing with the other children at the time, and that she waited more than a month to tell her mother about it.

Before the incident with appellant, when Jessica was attending a different church, she experienced a problem with the deacon, David Lopez.[3] Lopez taught Sunday school at the church. He would stay overnight at the homes of various congregation members. He spent the night at Jessica's house twice a week or less for several years. On those nights, he would come into the room that Jessica shared with her older brother and have sexual intercourse with her. Jessica believed he did this to the approximately seven other children in the church, both boys and girls. When Lopez sexually assaulted Jessica, she would scream loudly, sometimes at the top of her lungs, but her brother, who slept five to six feet away, never woke up. She told her mother and stepfather about Lopez's abuse after they caught her wedging shoes under the door to block it from opening. Her parents contacted the church and, a few years later, the police.

The May 1998 police report of Jessica's allegations against Lopez contained no accusation involving sexual intercourse. The report did not indicate that Lopez was Jessica's Sunday school teacher. It did not indicate that Jessica blocked her bedroom door with shoes or that her parents found out. According to the report, Lopez "stayed

---

[3] The following evidence of two other incidents where Jessica reported sexual abuse by church members was introduced by the prosecution in anticipation of the defense using it to impeach her.

with [Jessica's] family during the months of October and November, 1997" and committed approximately 20 sexual acts during that time. Jessica did not tell her parents about the incidents because she feared getting in trouble. She told numerous people, some from her church and some from school. Ultimately, one of those friends told her teacher at school, who contacted the police.

After the incident with Lopez, Jessica and her mother began attending the church where she encountered appellant. When Jessica talked to the police about appellant, she also told them about an incident involving another deacon at that church, Jose Linares. She would sometimes ride home with Linares in the pastor's van. One time he touched her "boob." She told him to stop. She could not remember anything else about the incident. According to the February 1999 police report, Jessica's mother was in the van when the incident occurred.

Linares and his wife, Reyna Concepcion, testified that appellant joined their church in 1996 or 1997. Jessica and her mother joined the church in 1998. In 1999, services ended around 9:15 p.m. After services, most people would come outside immediately to a table laid out with food. Nobody would watch the children while they were playing in the parking lot, but one of the women in the church who had a "special" child would always be there.

Linares testified that he and appellant were responsible for respectfully keeping order in the church. They regularly had to reprimand Jessica, who was "rambunctious" and walking around all the time. Concepcion described Jessica as a "restless child" who seemed like she had problems. Once, Linares told her to sit down because she was walking around the church. She looked angry and did not do as she was told. Two weeks later, Linares was arrested.

In January and February 1999, Concepcion and Linares took the van to and from church every day. Jessica and her mother would also take the van sometimes. The pastor always drove. Because Linares has two disabled legs, he would always sit behind the driver in the seat next to the window because it was safer and provided easier access in and out of the vehicle. Concepcion would always sit next to him. When Jessica and

7

her mother rode in the van, they would sit in the back. Jessica never sat next to Linares. Linares denied ever touching Jessica's breasts, and Concepcion never saw him do that.

When Jessica was about 13 years old, she told the police that a neighbor, Eduardo Roman, had been following her to and from the school bus every day for several months. According to the 2002 police report, Roman told Jessica that he wanted to marry her so they could have sex. Roman began following her with his friends, which made her fear for her safety. Her mother and aunt did not believe her.

Jonathan Arevalos, appellant's son, testified that in 1999, when he was seven or eight years old, he attended church with his father almost every night. After the services, the "main" people would stay inside but everyone else came outside to eat at the table full of food. The children would play handball and soccer in the parking lot. Jessica, the oldest, was two or three years older than Jonathan. She would try to kiss all of the boys and lift her skirt up. She told the boys that she would show her "private part" to whomever she picked to kiss. Jonathan told Jessica that what she was doing was bad and that he was going to tell her mother and his father. Jessica did not stop. She told Jonathan that she was going to tell her mother that his father had either hit her or touched her. Appellant was arrested about one or two weeks later.

EVIDENTIARY HEARING

Prior to trial, the prosecution moved under sections 1101, subdivision (b), and 1108 to admit evidence that appellant had committed an uncharged sex crime against Jessica. It sought to admit this evidence for the purpose of showing appellant's propensity to commit such acts, thereby bolstering T.R.'s credibility. Appellant moved to exclude the evidence.

The trial court held an evidentiary hearing at which it heard testimony about the alleged incident from Jessica, Linares, Concepcion, and appellant's son. Rather than call each of the individual police officers to testify, none of whom had any independent recollection of the events from more than a decade earlier, the parties submitted the police reports. In addition, Jessica testified about her mental health and other issues relating to her credibility.

8

Jessica testified that she first attended a mental health facility when she was 11 years old and stayed there for a month. From age 12 to 16, she lived in a group home and went "back and forth from the mental hospitals and their facilities," sometimes for more than a week. She was treated for bipolar disorder, which did not affect her memory. In March 2013, she fell into a coma for about a week. When she woke up, she had "trouble remembering some stuff" because of an interaction with prescribed drugs. She did not think it affected her memory of the incident with appellant other than that she could not remember "specifics."

Following the hearing, the trial court admitted the evidence involving Jessica under section 1108.[4] It began by "fram[ing] the issue." According to the trial court, "[a]ll of the evidence that was presented . . . was for the purpose of making a finding—finding as to whether Jessica should be deemed competent to testify." The court then explained why Jessica was competent to testify: "[L]et me start this way . . . not making any call on the case itself, but the witness, I believe, was responsive. She was forthcoming. She understood the questions. I believe that—well—and in that regard, I believe she's competent to testify.

"Whether she's believed by a jury in whole or in part or not at all is something a jury's going to have to decide. But I can't sit here as a judge—and from the record we have here—say she's incompetent to testify.

"In other words, I think she understands the meaning of the oath. I think she—she certainly understands the language. She's able to respond, and she responded to all the questions.

"Granted, she has a little or no memory of some regard. Some of her responses may raise questions; but overall, overall, I cannot—I cannot prevent her, the judicial officer, from testifying for any lack of competence."

---

**4** It is unclear whether the trial court also found the evidence admissible under section 1101, subdivision (b). When defense counsel asked for clarification, the court stated "[w]hen I instruct the jury, it will be—I'll use the instruction 1108 and any reference to 1101 that's necessary."

At that point, defense counsel interjected, explaining that he was not challenging Jessica's competency but rather was arguing that her testimony was completely unbelievable and should be precluded under section 352. Defense counsel then cited several examples from Jessica's testimony that he felt were implausible or contradictory. The trial court characterized counsel's argument as saying, "Judge, the district attorney and I have agreed to waive jury to you, and on the issue of whether [the prosecution's] position is sustainable beyond a reasonable doubt, these are the reasons why I feel they are not." The court then responded to what it perceived to be defense counsel's argument as follows:

"What I'm telling you is I'm not taking—I'm not disagreeing with you; but I'm not necessarily agreeing with you.

"The only way I would come to a conclusion that this witness is not competent is if her testimony would be wholly outlandish and not make any sense.

"Impeachable she is.

"In her case, [the prosecution's] responsibility is to prove by a preponderance of evidence that her version is true so as to support the charge—he has to prove beyond a reasonable doubt—involves the current victim in the case. That's what we're dealing with here.

"I'm not criticizing your presentation. I'm not criticizing [the prosecutor], his presentation, or either one of your cases. I'm just saying the call that you'd like me to make is not one I can make under the terms under—on this record and on the terms of—of competency."

Defense counsel then asked the court whether admitting Jessica's testimony would create an undue consumption of time. The court stated that while "[i]t will take time," it would not take as much time as the court had originally thought. The court pointed out that the evidentiary hearing had taken only a day and a half: Jessica's testimony was completed in an afternoon session and the defense witnesses took "part of the [previous] morning" and "then the balanc[e] of [that] afternoon." The court concluded that "that's not really an undue consumption of time."

10

DISCUSSION

"Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) A trial court's ruling on the admissibility of evidence under section 1108, like any ruling under section 352, is reviewed for abuse of discretion. (*People v. Story* (2009) 45 Cal.4th 1282, 1295.) " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' [Citations.]" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.)

"Discretion is delimited by the applicable legal standards, a departure from which constitutes an 'abuse' of discretion. [Citation.]" (*People v. Harris* (1998) 60 Cal.App.4th 727, 736.) Thus, a court abuses its discretion when it misconceives its duty or applies the wrong legal standard. (*People v. Carter* (2014) 227 Cal.App.4th 322, 328; accord, *Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1221 [application of incorrect legal standard when assessing admissibility of evidence constitutes abuse of discretion].) A trial court's failure to exercise its discretion is similarly an abuse of discretion, even when based on a mistaken belief that the court lacked discretion. (See *People v. Orabuena* (2004) 116 Cal.App.4th 84, 99-100; see also *People v. Bolian* (2014) 231 Cal.App.4th 1415, ___ [2014 WL 6779275, *3] ["'[W]hen an issue entrusted to the trial court's discretion is properly presented to the court for decision, the court must *exercise* its discretion: In such a case a statement or other evidence that the court believes it has no discretion, but must rule in a certain way, indicates an error so fundamental as to be said to amount to a refusal to exercise jurisdiction'"].)

In general, evidence showing a criminal defendant's disposition or propensity to commit the charged offense is inadmissible. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) The rules of evidence thus proscribe "evidence of a person's character . . . when offered to prove his or her conduct on a specified occasion." (§ 1101,

11

subd. (a).) This proscription applies, in particular, to evidence of specific instances of the defendant's uncharged misconduct. (*Ibid.*; *People v. Edwards* (2013) 57 Cal.4th 658, 711.) Ordinarily, such evidence is admissible, if at all, only to establish some material fact, such as intent, common plan, or identity. (§ 1101, subd. (b); *Villatoro*, at p. 1159.)

Section 1108 provides a "narrow exception" to the general rule. (*People v. Cottone* (2013) 57 Cal.4th 269, 285.) In sex offense cases, the trier of fact may consider evidence that the defendant committed other sex offenses in evaluating a credibility contest between the victim and the defendant. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911, 922.) Such evidence may be admitted to show the defendant's propensity to commit the charged sexual offense or for any other relevant purpose if its probative value outweighs its prejudicial impact on the defendant. (§§ 352, 1108, subd. (a); *People v. Loy* (2011) 52 Cal.4th 46, 63.) Before admitting evidence under section 1108, "trial judges *must* consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, at p. 917, italics added.)

Here, the trial court misapprehended the analysis it was required to undertake. Rather than considering the various *Falsetta* factors to balance the testimony's probative versus prejudicial value, the court simply evaluated Jessica's competency, a far less demanding standard. As the court explained, the "only way" it "would come to a conclusion that this witness is not competent is if her testimony would be wholly outlandish and not make any sense." By applying the wrong legal standard, the court abused its discretion.[5]

---

[5] Respondent argues that "the trial court implicitly found that Jessica's testimony was more probative than prejudicial." Nothing in the record supports this contention.

12

The court also abused its discretion by refusing to consider one of the most relevant factors—the degree of certainty that appellant committed the alleged crime against Jessica and the likelihood that the evidence would confuse, mislead, or distract the jurors from their main inquiry. Defense counsel implored the court to consider Jessica's "completely unbelievable" testimony, but the court refused to do so, stating that "the call that you'd like me to make is not one I can make." By failing to exercise its discretion, the court erred.

It makes no difference that the trial court eventually considered one relevant factor—the possibility that the evidence would create an undue consumption of time (§ 352)—because the court had already made its decision at that point. When the court began to explain the basis for its ruling, it informed defense counsel, "I don't think you'll be able to talk me out of this." Moreover, the court's finding that the evidentiary presentation would not unduly consume time was at best debatable, as we will explain. Furthermore, the consideration of just one relevant factor to the exclusion of all others is no less an abuse of discretion than the failure to consider any factors at all. (Cf. *In re Marriage of McTiernan and Dubrow* (2005) 133 Cal.App.4th 1090, 1106 ["[A] sustainable exercise of discretion requires that the trial court have considered and applied all relevant factors"]; *Tribune Newspapers West, Inc. v. Superior Court* (1985) 172 Cal.App.3d 443, 447 [concluding that "the respondent court committed an abuse of discretion in closing the fitness hearing in that an improper test for closure was used and all relevant factors were not considered"].)

Because the trial court abused its discretion admitting evidence under section 1108, we must determine whether "it is 'reasonably probable' that a result more favorable to the appealing party would have been reached in the absence of error." (*People v. Jandres* (2014) 226 Cal.App.4th 340, 360.) "'"[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an

___

While it is true that "a court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352" (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169), here the record shows otherwise.

13

*abstract possibility*."' [Citation.] Accordingly, we must assess the effect of the errors we have identified to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence. If it is, reversal is required." (*Ibid.*)

Had the trial court applied the *Falsetta* factors, it is reasonably probable that it would have excluded the evidence concerning Jessica. The one factor weighing squarely in favor of admission is the similarity between the incident described by Jessica and the current offense. Both involved accusations that appellant approached an unfamiliar 10-year-old girl in an isolated location at church and groped her around her genitals. However, the remaining factors weigh strongly against admission.

The incident involving Jessica was very remote. Jessica was 24 years old at the time of trial and 10 at the time of the incident. She admitted having trouble remembering "details" and gave an account that conflicted in several ways from the police reports. The staleness of the incident with Jessica weighs strongly against its admission, particularly when measured against appellant's blameless life in the interim. (See *People v. Harris*, *supra*, 60 Cal.App.4th at p. 739.)

Perhaps the strongest factor against admission of this evidence is the high degree of uncertainty that appellant actually committed the offense. Aside from the conflicts between Jessica's testimony and her statements to the police, some of the details of her story conflicted with the testimony of other witnesses. For instance, the church members who were adults in 1999 testified consistently that most of them went outside immediately after services ended whereas Jessica testified that they remained indoors for a time—thus providing appellant with the opportunity to assault her unobserved by other adults. Even if Jessica were credible on that point, it is difficult to believe that appellant would have assaulted her on a public street in front of the other children knowing that the adults were not far behind.

Jessica's credibility was further undermined by her history of making dubious charges of sexual abuse by adults, including another member of appellant's church whom she claimed abused her at approximately the same time as appellant. These

14

claims were inherently implausible. With Linares, she claimed that he groped her breast while her mother was in the van. Both Linares and his wife testified that he always sat by the window behind the driver to accommodate his disability, his wife always sat next to him, and Jessica and her mother, when they were there, sat at the back of the van. As for Lopez, Jessica claimed that he repeatedly raped her over a period of years in a bed six feet away from her sleeping brother, who did not awaken when she screamed at the top of her lungs.

Witnesses testified that Jessica had motives to lie about being sexually abused. Appellant's son described a threat that she made to frame appellant for either physical or sexual abuse if he reported her lewd behavior to her mother. Both Linares and his wife described how Jessica was angry with Linares for reprimanding her for her restless behavior.

Finally, multiple witnesses painted Jessica as an unstable, sexually aggressive girl. Linares's wife described her as restless and having problems. Appellant's son described how she would try to kiss younger boys and offer to "flash" them. Jessica herself admitted that she needed to be on antipsychotic medication but was not taking it at the time and had been in and out of mental hospitals during her teenage years.

It is not that it would be impossible to believe that Jessica was molested by several different men. As the prosecution's expert testified, this tragically does happen in some cases. However, there is no indication that the risk factors identified by the expert—an unsafe physical environment, violence in the home, or neglect by the care provider—were present here.

Thus, the probative value of Jessica's testimony was extraordinarily weak. It was more likely to confuse, mislead, or distract the jurors than to help them evaluate the probability that appellant molested T.R. This is especially so given the undue amount of time it took to present the evidence. More than half of the trial was spent trying Jessica's allegations. Of the 14 witnesses, five were relevant to T.R.'s allegations, seven

were relevant to Jessica's allegations, and two presented evidence relevant to both girls. As a direct result, the single count of lewd or lascivious act on a child required a five-day trial. The focus on Jessica's allegations transferred them from a supporting role to the main event and distracted the jurors from the task at hand. It also seriously impaired appellant's ability to defend himself against the charged offense. He was forced to defend against allegations from 14 years earlier that needed to be proven only by a preponderance of the evidence.

Finally, the evidence regarding Jessica was highly prejudicial. There was no evidence that appellant had ever had any other run-ins with the law, let alone involving sex crimes against minors. The case against him—the one involving T.R.—boiled down to a credibility contest. Introducing evidence that appellant had previously been arrested for molesting a child was extremely damaging to his case.

Given how unlikely it is that the trial court would have admitted this evidence had it properly weighed the relevant factors, we conclude that there is a reasonable possibility that the jury would not have convicted appellant but for the error. The evidence against him was not strong. As the trial court described it, the current case "barely stands on its own, and the only thing that gives it any type of support is this prior . . . conduct under [section] 1108."

Without Jessica's testimony, the prosecution's case turned entirely on the testimony of a 13-year-old child who had difficulty remembering important details of the incident from three or four years earlier, such as where appellant came from, which of his hands touched her in each place, or how long the groping lasted.[6] In addition, there was

---

[6] T.R. testified that she did not see where appellant came from. On cross-examination, after being shown the transcript of her interview with the counselor, she remembered that appellant had come from the bathroom. She testified that he shut the door to the main room with his foot while he was groping her. When asked why she told the counselor that he had shut the door with his hand before groping her, she could not remember saying that. After further questioning, she agreed it was true. Although she testified that appellant approached and grabbed her from behind, she could not explain why the police report stated that she turned around to face appellant before he grabbed her.

16

evidence of bad blood between T.R.'s mother and appellant's de facto wife, enough to raise a reasonable doubt if not for evidence that appellant had committed a similar crime in the past.  As it was, the jury took a day and a half to reach a verdict on a single count in a case that was not factually or legally complex.  In a close case such as this that turned entirely on a credibility contest, "'. . . "'any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial.'"' [Citation.]"  (*People v. Jandres*, *supra*, 226 Cal.App.4th at p. 360.)

The prosecution recognized the trial court's failure to appreciate the relevant legal standard for admissibility under section 1108.  Before the evidentiary hearing, the prosecution "respectfully disagree[d]" with the court's misstatement in that respect.  Then, citing *Falsetta*, the prosecution briefly explained the law and directed the court to the portion of its brief where it discussed the applicable legal standard.

We do not question the tragic reality that young girls are molested by multiple assailants as testified to by the prosecution's expert.  Our concern goes deeper.  Accepting the variety of risk factors attested to by that expert, none is identified in Jessica's life.  The extreme nature of what she testified to, however, gives us pause.  The rapes by her Sunday school teacher over a course of years as she lay screaming with her brother always sleeping by her side when the events occurred necessarily arouses concern.  Allegations that she was molested by another church member who was unable to walk without assistance and sat by his wife in the van during the purported commission of these offenses compound these concerns.  The entire history placed before the trial court necessarily shakes the foundation of the purportedly relevant character evidence offered by Jessica.  By its own terms section 1108 demands the trial court carefully examine the evidence under the microscope of section 352.  Here it appears not to have understood the role of section 352 in the analysis of this evidence.  Consequently,

17

the rigorous review required was never applied.

DISPOSITION

The judgment is reversed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

I concur:

GILBERT, P. J.

Yegan, J., Dissenting.

I respectfully dissent. The majority conclude that appellant was denied a fair trial because the trial court, at a *pretrial* Evidence Code section 1101(b)/1108 hearing, failed to explicitly find that the probative value of the uncharged sex offense (i.e., the molestation of 10-year old Jessica) outweighed the potential for prejudice (§ 352)[1]. Section 352 ruling does not require the recitation of any "magic words." (*People v. Garrett* (1987) 195 Cal.App.3d 795, 801.) And there is no requirement that the trial judge expressly weigh prejudice against probative value or even say that he has done so. (*People v. Crittenden* (1994) 9 Cal.4th 83, 135.)

At the section 1101(b)/1108 hearing, defense counsel argued that, pursuant to section 352, the trial court had to determine whether Jessica "is being forthright and honest or . . . completely lying under oath repeatedly." On appeal, appellant claims that Jessica is bipolar and incapable of telling the truth, but that conflates competency to testify and witness credibility with section 352. "To the extent defendant contends [Jessica's] responses were incompetent because [s]he was lying, this was, of course, an issue of credibility for the jury . . . [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 589-590.)

The trial court found that Jessica was forthcoming and responsive to the questions, and that "whether she's believed by a jury in whole or in part or not at all is something a jury's going to have to decide." Defense counsel asked, "[W]hat about the undue consumption of time?" He argued that he had so much impeachment evidence (inconsistent police reports, Jessica's mental history, a one month delay in reporting the incident, Jessica's flirtatious behavior and victimization by others), that it would result in the undue consumption of time. The trial court agreed the impeachment evidence would take time, but not result in an undue consumption of time or confuse the jury.

The majority fault the trial court for not making express findings on other section 352 factors. But, appellant waived any deficiency in the ruling by not pressing

---

[1] All statutory references are to the Evidence Code

for an express 352 ruling.. (*See e.g., People v. Rowland* (1992) 4 Cal.4th 238, 259.) Other than "undue consumption of time," appellant's only argument was that Jessica was a psychological liar.

The prosecution's section 1108 motion set forth all the section 352 factors. The molestation of Jessica was highly probative because Jessica, like Tabitha, was groped at a small church that appellant attended. Both girls were 10 years old, were isolated from the rest of the congregation, and roughly grabbed on the vaginal area. Both children had sporadic contact with appellant, had no reason to expect they would be assaulted, and identified appellant. Substantial evidence supports the finding that the molestation of Jessica was not stronger or more inflammatory than the charged offense, likely to mislead or confuse the jurors, or too remote in time. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 282 [30-year-old uncharged child molestation; significant similarities between the prior and charged offenses may balance out remoteness]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [same; prior acts of molestation occurred 21 to 28 years before charged offense]; *People v. Hernandez* (2011) 200 Cal.App.4th 953, 968 [remoteness in time - 40 year old uncharged act - goes to the weight of the evidence, not its admissibility].) "The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules. [Citations.]" (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

The majority hold that the trial court's finding on undue consumption of time is debatable and that Jessica had a motive to lie. It is not our job to reweigh the evidence. The inquiry is whether the trial court's exercise of discretion under section 352 was palpably arbitrary, capricious, whimsical, or patently absurd. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124; *People v. Kipp* (1998) 18 Cal.4th 349, 371 [352 ruling must fall outside the bounds of reason].)

Although reasonable minds may differ on whether Jessica was a credible

2

witness, that was and is a jury call.  Appellant received a fair trial.  The judgment should be affirmed.

NOT FOR PUBLICATION


YEGAN, J.

Norm Shapiro, Judge

Superior Court County of Los Angeles

---

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Mary Sanchez, Deputy Attorney General, for Plaintiff and Respondent.